IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRELL WILLIAMS-BEY,  :
          :
  **Plaintiff,**    :
          :
**vs.**         :   **CIVIL ACTION 14-00490-CG-C**
          :
**DAVID B. CARPENTER, II,** *et al.* :
          :
  **Defendants.**   :

## Report and Recommendation

Plaintiff, a former Alabama prison inmate proceeding *pro se* and *in forma pauperis* filed a complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of Defendants, David B. Carpenter, II, Ric Yelding, and Donald Bell (Doc. 23).  For the reasons stated below, it is recommended that the motion for summary judgment of Defendants be granted and that Plaintiff's action against Defendants be dismissed with prejudice.

### I.  Summary of Factual Allegations.

Plaintiff Williams-Bey's complaint arises from his incarceration in the City of Daphne, Alabama Jail.  He alleges that the defendants, Chief of Daphne Police, David B. Carpenter, II, Division Supervisor of Support Services of City of Daphne Jail, Ric Yelding, and Chief Corrections Officer for the City of Daphne Jail, Don Bell, were deliberately indifferent to his medical needs and were responsible for unconstitutional conditions at the jail.

Plaintiff was sentenced to serve 365 days in the City of Daphne Jail ("Daphne Jail") after being convicted of driving under the influence and driving

with a suspended license.  (Doc. 1 at 4).  Plaintiff was booked into the Daphne

Jail on September 27, 2014, and was placed in cellblock A on September 30, 2014.

(Id., Doc. 22-1 at 12).  A few days after being assigned to cellblock A, Plaintiff

claims he noticed the shower water in cell block A was not properly draining

and, instead, was producing standing water on and around his feet.  (Doc. 22-1 at

15).  Plaintiff filed a grievance on October 13, 2014, reporting that the showers

and toilets in his cell were "backing up" and that the shower walls were

mildewed.  (Doc. 22-5 at 4).  In response to the grievance, Officer Smith plunged

the toilet to assure its correct functioning and, despite not observing any mold on

the walls, she utilized bleach spray on the shower to sanitize any potential

hazard.  (Id. at 5).  Officer Smith also observed and noted in her filed incident

report that the inmates in cellblock A were not using the cleaning cart on a daily

basis to clean the showers as they were directed to do per Daphne Jail policy.

(Id.).  In addition to Plaintiff's complaints, officers also attempted to fix the

shower drain on two separate occasions by pouring Liquid Fire, a Drano type

solution, down the drain in cellblock A to unclog it.   (Doc. 22-1 at 15).  Plaintiff

was ultimately transferred from cellblock A to cellblock D on or about November

23, 2014, and admittedly has had no further drainage issues.  (Id. at 16-17, 32-33;

Doc. 22-5 at 17).

  Plaintiff alleges Defendants were aware of the drainage issues of cellblock

A prior to his detention at the jail[1] and that their deliberate indifference to the

---

[1]  Plaintiff has submitted an unsworn affidavit by inmate Aarron Paulk which
avers that the shower in cellblock A was "backing up" when he arrived at Daphne Jail
on September 23, 2014. (Doc. 25 at 2-3).  He stated that his feet were submerged in water
during his shower and that mold and mildew were present in the shower until
November 2014.  (Id. at 3).  He further attests that no disinfectant was provided for
cleaning the shower area.  (Id.).

conditions caused him to develop a foot fungus to which the defendants denied him proper medical attention. (Doc. 25 at 2-3; Doc. 1 at 4). Plaintiff states when he first noticed a problem with his feet, he assumed he was suffering from "athletes foot" and requested and received antifungal cream. (Doc. 22-1 at 18). However, when the condition worsened, Plaintiff began to file requests for medical treatment and to be examined by a doctor. From October 4, 2014 through November 23, 2014, he filed eight requests for medical treatment relating to the rash on his feet. (See Doc. 22-5 at 2, 7, 9-10, 12-15). Each request was promptly responded to by the nursing staff[2] and included prescribed treatment plans, including antifungal creams and powders, and follow up appointments to examine and assess Plaintiff's condition. (Id.). On November 30, 2014, Plaintiff again requested to be seen by a doctor regarding the condition of his feet, and the treating nurse made the recommendation that Plaintiff be examined by a medical doctor, and an appointment was scheduled for him. (Doc. 22-5 at 18).

On December 2, 2014, Plaintiff was first examined by a physician who diagnosed Plaintiff with bacterial intertrigo[3] that appeared to be mostly between

---

[2]      The medical staff at Daphne Jail is provided by an independent company called Bay Area Nursing, who provides nurses to visit the Daphne Jail several times a week (typically on Mondays, Wednesdays, and Fridays). (Doc. 24 at 6). Daphne Jail's protocol when an inmate submits a medical requests is to have the nursing staff first exam and treat the inmates' conditions. (Id.). If it is determined that an inmate needs further medical treatment, a nurse will recommend such, and the Daphne Jail will then schedule an appointment with an outside physician and will provide the transport of the inmate to the doctor's office and provide the necessary prescribed treatment. (Id.).

[3]      "Intertrigo is a fancy name for a rash that shows up between the folds of skin. It is a very common skin rash that can crop up throughout life." WebMD, http://www.webmd.com/skin-problems-and-treatments/guide/intertrigo-symptoms-causes-treatment-risk_factors_ (last visited June 17, 2015). The rash can "appear in any skin folds that rub together and trap moisture," like between the toes, armpits, inner thighs, groin area, or the underside of breasts or stomachs. (Id.). Moisture, heat, lack of

the webbing of Plaintiff's toes.  (Doc. 22-2 at 16).  Plaintiff was prescribed a 10-day course of antibiotics, Bactrim and Mupirocin ointment.  (Id.).  Eight days later Plaintiff complained to the jail nursing staff that the treatment was not working and requested a follow-up appointment; however, when the nurse examined him, he admitted that the foot condition appeared to be improving, and it was determined that Plaintiff continue the prescribed treatment for the duration recommended by the doctor before returning to the doctor or altering the medication.  (Doc. 22-5 at 22).  When the course of treatment ended but the problem remained, a follow-up appointment was made with the same doctor.

On January 1, 2015, Plaintiff was reexamined and another round of Bactrim was prescribed in addition to Nizoral, an antifungal antibiotic, and Loprox, a broad spectrum antifungal cream.  (Doc. 22-2 at 13).  Plaintiff also began to request referral to a specialist at this time.  (Doc. 22-5 at 30).  The nurse noted on January 20, 2015, after examining Plaintiff, that his feet showed no signs of infection or open areas, but she did recommend Plaintiff be seen by a doctor. (Id.).

Plaintiff returned to the previous doctor on January 29, 2015 and the doctor altered Plaintiff's prescriptions to Lamisil, an antifungal cream, and Keflex, an antibiotic.  (Doc. 22-2 at 9).  Plaintiff subsequently complained that his condition was not healed and requested to be examined by a specialist on February 18, 2015.  (Doc. 22-5 at 34).  In response to Plaintiff's request, the nurse on call informed Plaintiff that the prescribed treatment took a while to take effect and she recommended that he continue with the treatment plan through the duration of the prescribed time.  (Id.).  On March 2, 2015, Plaintiff submitted

air circulation, and friction between the skin folds all worsen the condition.  (Id.).

another request to see a specialist, and despite there being no breakage or infection of the skin on Plaintiff's feet, Plaintiff was again referred to a physician. (Doc. 22-5 at 40).

Thereafter, on March 6, 2015, Plaintiff was taken to the same doctor who had provided treatment to him before. (Doc. 22-2 at 4). At the appointment, Plaintiff admitted to the doctor that the affected area of his feet did not particularly hurt or itch, but the condition between his toes was just not healed. (Id.). On this final visit to the doctor, Plaintiff was prescribed zinc oxide paste, hydrocortisone acetate powder, and nystatin powder to help with the bacterial, fungal condition and to alleviate the consistent moisture issue that was continuously present upon examination. (Id. at 7). Plaintiff states he began this treatment plan on April 11, 2015, when all of the prescriptions were obtained. (Doc. 22-1 at 28). The complaint nor Plaintiff's response to Defendants' filings report any further doctor visits, requests for treatment, or worsening of symptoms after the final treatment plan was implemented.

Plaintiff alleges Defendants were deliberately indifferent to the treatment of his medical condition by failing to take him to the doctor for two months after his initial request and for failing to refer him to a specialist. (Doc. 25 at 6-7). Additionally, Plaintiff complains in this suit that Defendants are liable for housing him in unconstitutional conditions by holding him in a jail with an unsanitary shower and "without access to any recreation or fresh air." (Doc. 1 at 5). He alleges Defendants failure to provide him with access to outdoor recreation caused him to suffer skin rashes and joint pain. (Doc. 25 at 6).

Since the filing of this action, Plaintiff Williams-Bey has been released from the City of Daphne Jail. (Doc. 9 in Civil Action No.: 15-176-CG-N).

II.      **Procedural History**

Plaintiff Williams-Bey's commenced this action by executing his complaint on October 17, 2014 (doc. 1) and executing his motion to proceed *in forma pauperis* on October 20, 2014.  (Doc. 3).  Both filings were received and docketed by the Court on October 21, 2014.  (Doc. 1, 3).  Additionally, on October 21, 2014, he executed a motion for a temporary restraining order against the defendants, alleging the defendants were opening his outgoing and incoming legal mail, withholding time-sensitive mail, and making copies of correspondence between Plaintiff and the Court.[4]  (Doc. 3).  Plaintiff requested an injunction prohibiting Defendants from interfering with his access to the courts. (Id.).  Defendants filed a response in opposition to the motion.  (Doc. 9). Plaintiff's motion for a temporary restraining order, Defendants' opposition thereto, and Plaintiff's reply, as well as Defendants' motion for summary judgment, along with Plaintiff's objection thereto, is now before the Court for consideration.

III.     **Summary Judgment Standard**

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[4]      Plaintiff does not clearly specify what piece of legal mail Defendants opened, but based on the provided dates of the occurrence cited by the parties and Plaintiff's additional allegations, the Court denotes that it was this current lawsuit which was illegally opened on October 20, 2014.

to judgment as a matter of law."  In Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986), the Supreme Court held that summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact. . . ."  However, all of the evidence and factual inferences reasonably

drawn from the evidence must be viewed in the light most favorable to the

nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson

v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

The party seeking summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion, and

identifying those portions of the 'pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact."

Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting

evidence showing there is no dispute of material fact or by pointing out to the

district court that the nonmoving party has failed to present evidence in support

of some element of its case on which it bears the ultimate burden of proof.  Id. at

322-25.

Once the moving party has satisfied its responsibility, the burden shifts to

the non-movant to show the existence of a genuine issue of material fact.  See

Stabler v. Fla. Van Lines, Inc., No. 11-0103-WS-N, 2012 WL 32660, *5 (S.D. Ala.

Jan. 6, 2012) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.

1991)).  Summary judgment is proper when, "after an adequate time for

discovery, a party fails to make a showing sufficient to establish the existence of

an essential element of that party's case."  McDowell v. Brown, 392 F.3d 1283,

1288 (11th Cir. 2004) (citations and internal quotation marks omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).  "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  AGSouth Genetics, LLC v. Cunningham, No. 09-745-C, 2011 WL 1833016, *2 (S.D. Ala. May 13, 2011).

**IV.   Analysis**

> 1.   Denial of Medical Treatment.

Plaintiff alleges that Defendants violated his Eighth Amendment rights by failing to provide proper medical treatment for the skin condition he contracted on his feet in October 2014.

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs."  Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).  To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need."  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002)).  "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm."  Id.  (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need.  Farrow, 320 F.3d at 1243.  "Deliberate indifference" entails more than mere negligence.  Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added).  In interpreting Farmer and

> Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott,* 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

To survive summary judgment, Plaintiff must produce evidence that Defendants were deliberately indifferent to his medical needs. A review of the record belies Plaintiff's claim.

Rather than demonstrating deliberate inference, these undisputed facts reveal that Plaintiff was provided medical treatment and that Defendants tended to each complaint and need with which Plaintiff presented. The facts of the record are undisputed and do not evidence a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted.") (internal citations omitted).

The Court begins its analysis of Plaintiff's claim by noting that it is arguable as to whether Plaintiff's foot condition even represents a serious medical need. See Tsakonas v. Cicchi, 308 F. App'x 628, 632 (3d Cir.2009) (holding that "eczema of the feet [and] athlete's foot" are not objectively serious under the Eighth Amendment); Bixler v. Shaw, 10-CV-745-JED-FHM, 2014 U.S. Dist. LEXIS 4648 (N.D. Okla. Jan. 14, 2014 ) (lingering foot fungus without alleged harm as a result of denied medication was not "sufficiently serious" to rise to the level of a constitutional violation.). The evidence suggests that while

Plaintiff's condition was obviously a lingering problem, it was hardly severe as it never threatened harm to Plaintiff's health, restricted his daily activities, nor did it cause him extreme discomfort.  In fact, Plaintiff admits the rash did not particularly hurt or itch, it was just persistent and resisted treatment.  (Doc. 22-2 at 4).  And a review of both the nurses and doctor's notes reveal the main attributing cause of non-healing was due to moisture in the affected area.  (See Doc. 22-2 at 7; Doc. 22-5 at 13-14).  Interestingly, when Plaintiff gave his statement to the Defendants' attorney in preparation for the motion for summary judgment currently before the Court, he came to the interview with his feet clothed in socks and flip-flops.  Doc. 22 at 29-30).  Plaintiff stated he always wore socks with his issued flip-flops because it was cold within the jail.  (Id. at 30).  Understanding that most persons would prefer warmth and comfort over drafty conditions and cold toes, it is likely that Plaintiff's choice to wear socks under his flip-flops on a continuous basis hindered the healing process of his toes by trapping heat and moisture within his socks.  (See doc. 22-2 at 7 where doctor recommended Plaintiff wear open toe shoes to promote drying of his feet and prevent moisture; see also doc. 22-5 at 13-14 where the Daphne Jail nurses provided and prescribed cotton balls to be placed in between Plaintiff's toes to absorb moisture.).

Assuming, however, that Plaintiff's rash is considered a serious medical need and Plaintiff did not exacerbate or purposefully hinder his healing, the Court finds no evidence that Defendants were deliberately indifferent to his medical needs. The extensive number of medical requests filed by Plaintiff that were promptly responded to reveal that Defendants were not deliberately indifferent to his needs.  See Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir.

1989) ("When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation.").  The mere fact that Plaintiff's condition was resistant to multiple treatments does not negate the care and attention he received.  Instead the allegations of the complaint suggest that Plaintiff disagreed with the medical treatment provided by Defendants.  However, a disagreement over the course of medical care, alone, does not rise to the level of deliberate indifference and cannot support a § 1983 claim.  See Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment).  The bottom line is that while Plaintiff is entitled to treatment for his serious medical needs, he is not entitled to direct the course of treatment that he receives.  Accordingly, the fact that Plaintiff was first seen and treated by nurses instead of a doctor is not indicative of indifference, as he was personally examined and medication was provided for each complaint. And once the nurses felt confident that they could not treat the problem, Plaintiff was referred to a doctor, without a worsening of his symptoms, within days. And, the fact that Plaintiff was not provided a specialist referral immediately upon his initial requests does not evidence that Defendants acted with deliberate indifference, particularly when the record is void of any medical complaints indicating a different or more aggressive treatment plan was needed.  Plaintiff was taken to the doctor four times between December 2014 and March 2015.  He

was treated with various antibiotics and prescription strength antifungal creams and powders. Despite the continued rash on his feet, Plaintiff never complained of pain or suffering due to the condition – merely that it wouldn't completely heal. Furthermore, Plaintiff admitted on different occasions that the treatments seemed to be working but then the rash would return or never completely heal. However, unsuccessful treatment does not equate to deliberate indifference. Notably, each time Defendants became aware that Plaintiff needed medical attention they promptly acted, first with nurses and then with doctor visits. Additionally, each time a medicine or treatment was prescribed, Defendants obtained the prescription and assured that Plaintiff received the treatment as ordered. The evidence and facts refute the allegations of deliberate indifference.

As to Plaintiff's claim of delay of treatment constituting an Eighth Amendment violation, the undersigned finds that he has failed to demonstrate such unreasonable delay in medical treatment as to hold Defendants liable.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Id.

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical

> treatment to succeed.  Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

With respect to any alleged delay, there is no evidence that there was an unreasonable delay in providing medical treatment to Plaintiff, or that there was any detrimental effect from any alleged delay in treatment. As noted *supra*, the record is replete with documentation of the regular and consistent medical treatment that was provided to Plaintiff during his placement at Daphne Jail.[5] (Docs. 22-2; 22-5).  The records reflect that for the time period Plaintiff complains, from October 4, 2014 through April 9, 2015, all 29 of Plaintiff's medical requests were responded to expeditiously, including those involving his feet, as well as others that concerned a corn on his toe, toothaches, constipation, and breakouts and rashes on his face.  (See Doc. 22-5).  Within these medical requests, Plaintiff never articulates that his feet, or any complained of condition, is actually worsening.  To the contrary, when initially seen by the doctor two months after first noticing the rash on his foot, the doctor assessed Plaintiff's condition as a bacterial problem, but noted it could be associated instead to yeast or fungus, but prescribed antibiotic treatments first.  (Doc. 22-2 at 16-17).  At Plaintiff's next visit, Plaintiff admitted, "he did get better temporarily;" however, the problem

---

[5]     Although Plaintiff has limited the scope of his allegations to the treatment of the rash on his feet, the Court notes that Plaintiff received proper medical treatment and care throughout his incarceration at Daphne Jail.  He was seen by a nurse each time his requested medical treatment (see doc. 22-5), he was provided corn pads for his toe (doc. 22-5 at 8, 11), pain medication for his toothache (id. at 3, 6), stool softener for constipation (id. at 2), steroid cream for facial rashes (id. at 16, 23, 29, 33), and new deodorant for a rash that developed under his arm (id. at 17-18).

returned between most of his toes and he contracted an itchy rash in his groin/inner thigh area.  (Id. at 11-12).  The record then indicates that two months later, despite none of the treatments completely curing the ailment, Plaintiff admitted that the rash didn't "especially hurt or itch" and every nurse's note indicated that the rash area never appeared infected or had broken or open sores. (Doc. 22-2 at 4; Doc. 22-5 at 13-15, 2, 30, 40).  There is no evidence of harm or detriment to Plaintiff in any delay that may have arguably occurred in his referral to a doctor or specialist.  In light of such, Plaintiff's claims against Defendants are due to be dismissed.

      2.    <u>Unconstitutional conditions at Jail.</u>

      The Constitution does not require that places of incarceration be comfortable. *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2401, 69 L.Ed.2d 59 (1981).  All that is required is that the State furnishes "its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir.), *rev'd in part sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S. Ct. 3057, 57 L.Ed.2d 1114 (1978); *see Helling v. McKinney*, 509 U.S. 25, 32, 113 S. Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1574 (11th Cir.), cert. denied, 475 U.S. 1096, 106 S. Ct. 1492, 89 L. Ed. 2d 894 (1986).  In order to prevail on an inhumane conditions of confinement claim, an inmate must satisfy an objective component and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 1983, 128 L.Ed.2d 811 (1994).  The objective component requires the Court to look to "contemporary standards of decency," to determine whether the challenged condition resulted in a deprivation of "the minimal civilized measure of life's necessities," *Rhodes*, 452 U.S. at 347, 101 S. Ct. at 2399, or, at a minimum, of a

"single human need[.]" *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S. Ct. 2321, 2327, 115
L.Ed.2d 271 (1991); *see Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994).
Moreover, the challenged condition must be "extreme . . . [b]ecause routine
discomfort is 'part of the penalty that criminal offenders pay for their offenses
against society, only those deprivations denying the minimal civilized measure
of life's necessities are sufficiently grave to form the basis of an Eighth
Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000,
117 L.Ed.2d 156 (1992) (citations and quotation marks omitted). "Nothing so
amorphous as 'overall conditions' can rise to the level of cruel and unusual
punishment when no specific deprivation of a single human need exists." *Wilson*,
501 U.S. at 305, 111 S. Ct. at 2327; *Jordan*, 38 F.3d at 1564.

Plaintiff alleges that Defendants provided unsanitary shower conditions at
Daphne Jail that were unconstitutional. He complains that the "drainage has
been backing up in the shower area and the toiletries." (Doc. 1 at 4). The
drainage backup Plaintiff describes is that of a clogged drain, versus sewage
backing up in the drain. He explained that after the shower had been running
for a while, the water would not quickly drain and some of water would remain
standing and would submerge his feet. (Doc. 22-1 at 13-15). This is not a severe
or extreme condition of confinement that posed an unreasonable risk of serious
harm to Plaintiff's health and safety. See Chandler v. Crosby, 379 F.3d. 1278,
1289 (11th Cir. 2004) (holding that a prisoner must prove that the prison
condition he complains of is sufficiently serious and "extreme" to violate the
Eighth Amendment); see also, Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)
(a backed up shower drain that caused water to flow into the dayroom was not
sufficiently serious to rise to the level of a constitutional violation); Landfair v.

Sheahan, 878 F. Supp. 1106, 1112-13 (N.D. Ill. 1995) (shower plumbing deficiencies that caused plaintiff to contract athlete's foot did not rise to level of a constitutional violation); Venturi v. Boyd, 3:14-cv-00823-CLS-TMP, 2014 U.S. Dist. LEXIS 158813 (N.D. Ala. Oct. 14, 2014) (mold in the shower area and withholding of cleaning supplies for thirty day duration did not rise to level of constitutional violation); Sanders v. Allen Cnty. Jail, No. 06-CV-302 (RL), 2006 U.S. Dist. LEXIS 64232, 2006 WL 2578977, at *2 (N.D. Ind. Sept. 6, 2006) (holding that a dirty, moldy shower which resulted in plaintiff contracting Athlete's foot was not a serious medical condition).  Accordingly, the Court concludes that Plaintiff's alleged conditions do not rise to the level of an Eighth Amendment violation.  Alfred v. Bryant, 378 F. App'x 977, 980 (11th Cir. 2010) ("'Inmates cannot expect the amenities, conveniences and services of a good hotel.'" (quoting Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988)).  Because the objective component has not been satisfied, Plaintiff has failed to state a claim based on his conditions of confinement. *See Chandler v. Crosby*, 379 F.3d 1278, 1297 (11th Cir. 2004) (declining to discuss the subjective component when the inmate failed to meet his burden on the objective component).

Assuming *arguendo* that the clogged shower drain was considered objectively serious, the evidence is void that the named defendants were subjectively aware the Plaintiff faced a "substantial risk of serious harm" and disregarded that risk by failing to take reasonable measures to abate it.  See Farmer, 511 U.S. at 828, 834, 837.  Contrarily, the record reveals and Plaintiff's own grievances support that Defendants responded to Plaintiff's complaints and grievances regarding the shower. Defendants had Officer Smith spray the affected area with disinfecting bleach and plunge the toilets (doc. 22-5 at 5);

Defendants had clog remover, Liquid Fire, poured down the shower drain on two separate occasions (doc. 22-1 at 15); and, Defendants removed Plaintiff from the cellblock at issue and placed him in a cell with no drainage issues (doc. 22-1 at 16-17, 32-33).  As such, Plaintiff fails to create a genuine issue of material fact on the question of whether or not Defendants violated his right to constitutional conditions of confinement, and summary judgment is due to be granted to Defendants. Cf., Peterson v. Morin, 2:11-cv-176, 2012 U.S. Dist. LEXIS 67771, *30-32 (S.D. Tex. Apr. 5, 2012) (Defendants' summary judgment was denied where the defendants were made aware of the unsanitary conditions but failed to respond to grievances or provide necessary cleaning supplies).

     3.     Breach of Fiduciary Duty

In his complaint, Plaintiff makes the conclusory allegation that Defendants breached their fiduciary duties.  (Doc. 1 at 5-6).  This unsupported allegation is insufficient to sustain a § 1983 claim.

The elements of a breach of fiduciary duty claim are: "the existence of a fiduciary duty and the breach of that duty such that it is the proximate cause of the plaintiff's damages."  Wilson v. Everbank, N.A., 2015 U.S. Dist. LEXIS 8315, *30-31 (S.D. Fla. Jan. 5, 2015) (citing Gracey v. Eaker, 837 So.2d 348, 353 (Fla. 2002)).  Plaintiff fails to provide facts to support his allegation or to establish any of the needed elements of his claim.

Traditionally there is no fiduciary relationship between an inmate and a warden, sheriff, police officer, or jailer, and Plaintiff fails to convince the Court of an exception in this action.  Furthermore, he fails to allege details supporting a breach of any fiduciary duty or articulate facts connecting the alleged breach to any damages.  Due to Plaintiff's inability to carry his burden of proofing a breach

of fiduciary duty, [6] Defendants should be granted summary judgment on this claim.

### 4.      Denial of Outdoor Recreation.

Plaintiff also alleges that he was subjected to cruel and unusual punishment because he was denied outside recreation while jailed. Specifically, he claims he was denied the "opportunity to receive a free source of vitamin E[sic], i.e. The sun's most gracious gift, in order to keep ones skin healthy. Plaintiff has been plagued with facial rashes do[sic] to his lack of outdoor recreation and is currently prescribed creams and ointments for his facial rashes etc. (Doc. 25 at 4-5) (capitalization altered from original).

Plaintiff's claims are not extreme as his challenged prison condition does not "pose[] an unreasonable risk of serious damage to the prisoner's health or safety." *Richardson*, 598 F.3d at 737.   Facial breakouts do not constitute an unreasonable risk to Plaintiff's safety or health, nor do they cause extreme pain or discomfort to rise to the level of supporting n Eighth Amendment violation. Furthermore, not being allowed to exercise outside, in and of itself, does not

---

[6]       "A document filed pro se is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers..." E.g., Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (citation and quotations omitted). Nevertheless, "a court may not 'serve as *de facto* counsel for a party' or 'rewrite an otherwise deficient pleading in order to sustain an action.'" Muhammad v. Bethel, 430 F. App'x 750, 752 (11th Cir. 2011) (quoting GJR Invs., Inc. v. Cnty. of Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998), overruled on other grounds, see Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010)). Additionally, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) (internal citation omitted).  Accord, e.g., Gennusa v. Canova, 748 F.3d 1103, 1116 (11th Cir. 2014).

demonstrate a deprivation of a single human need.  *Green v. Ferrell*, 801 F.2d 765, 771-72 (5th Cir. 1986) (there is no absolute right to outdoor exercise under Constitution).

Undue restrictions on inmates' opportunities for physical exercise have been deemed to violate the Eighth Amendment when the restrictions posed an unreasonable threat to the inmates' physical and mental health.  See Clay v. Miller, 626 F.2d 345, 347 (4th Cir. 1980); Kirby v. Blackledge, 530 F.2d 583, 586 (4th Cir. 1976); Rhem v. Malcolm, 507 F.2d 333, 337 (2d Cir. 1974), enforced, 377 F. Supp. 995 (S.D.N.Y.1974), aff'd, 527 F.2d 1041 (2d Cir. 1975), enforced, 432 F. Supp. 769 (S.D.N.Y.1977).  The facts of Clay v. Miller, are similar to those of this action.  Clay was confined in his cell for six hours a day, but had access to the day room for the remaining eighteen hours of the day.  The Fourth Circuit affirmed the district court's entry of summary judgment against the plaintiff's claim determining that Clay failed to show his mental or physical health was threatened as a result of not being provided more space or facilities than the day room for exercise.  Clay, 626 F.2d at 347.

To determine if a constitutional violation exists, the Court must analyze the totality of conditions under which a prisoner is incarcerated in considering the question of adequate exercise opportunities.  See Sweet v. South Carolina Dep't of Corrs., 529 F.2d 854 (4th Cir. 1975) ("Cruel and unusual punishment," as used in the Eighth Amendment, is a term that cannot be defined *in vacuo*. It does not draw its meaning simply from the type of punishment or deprivation imposed; it is often intimately concerned with the time covered by the punishment or deprivation and the reasonable limits of prison supervision."); Ruiz v. Estelle, 679 F.2d 1115, 1152 (5th Cir. 1982), cert. denied, 460 U.S. 1042, 103

S. Ct. 1438, 75 L. Ed. 2d 795 (1983) ("Of particular importance in determining an

inmate's need for regular exercise are the size of his cell, the amount of time the

inmate spends locked in his cell each day, and the overall duration of

confinement.").  The Eleventh Circuit has further held that a "complete denial . . .

of outdoor exercise, although harsh, [does] not violate the Eighth Amendment."

Bass v. Perrin, 170 F.3d 1312, 1317 (11th Cir. 1999).

> In addition, the behavior of the defendants cannot properly be
> described as "wanton."  Wantonness has been defined as "deliberate
> indifference to a substantial risk of serious harm to a prisoner."
> Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 1978, 128 L.
> Ed. 2d 811 (1994).  The record is filled with evidence indicating that
> prison officials were very concerned about the potential harm to
> inmates from placement on the [Yard Suspension List], and took a
> variety of steps to ensure that the plaintiffs were not harmed as a
> result of their continuous confinement. The plaintiffs received daily
> cell-front medical evaluations, and received more thorough medical
> examinations upon request. Any problems discovered were
> promptly treated. Furthermore, a booklet (along with training from
> medical personnel) was made available to the plaintiffs detailing
> proper methods of exercise while in confinement. The plaintiffs
> also received weekly cell-front psychological evaluations, and
> could receive further examinations upon request. We therefore
> conclude that the defendants were not "wanton" in their conduct.
> Cf. Helling v. McKinney, 509 U.S. 25, 36-37, 113 S. Ct. 2475, 2482,
> 125 L. Ed. 2d 22 (1993) (recognizing preventative measures taken by
> prison officials as strong evidence that they were not deliberately
> indifferent to risks of prisoner harm).
>
> The pain suffered by the plaintiffs was thus neither unnecessary
> nor wanton. We therefore conclude that the complete denial to the
> plaintiffs of outdoor exercise, although harsh, did not violate the
> Eighth Amendment.

Bass v. Perrin, 170 F.3d 1312, 1317 (11th Cir. Fla. 1999).  The facts of Bass,

inmates held in solitary confinement and deprived of all outdoor exercise time,

demonstrate the outer limits of what may be deemed constitutional when a

threat to security and safety of the prison is evidenced and precautions are

observed to ensure the inmates' wellbeing.  See Id. at 1316.  The facts currently before the Court are not this harsh or extreme, however.

To prevail on his claim, Plaintiff must show that Defendants were deliberately indifferent to his exercise needs.  Wilson v. Seiter, 501 U. S. 301, 303 (1992).  Additionally, the Court must look to the effect the condition had upon the inmate in determining whether or not the lack of exercise and outdoor recreation constitutes a constitutional violation.  Rhodes v. Chapman, 452 U.S. 337, 366 (1981).  In considering an alleged deprivation of adequate exercise, courts must consider several factors including: (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of the confinement.  Ruiz v. Estelle, 679 F.2d at 1152.  A lack of exercise will be found to be a constitutional violation if an inmate's health is threatened or muscles are allowed atrophy.  French v. Owens, 777 F.2d 1250, 1255 (7th Cir. 1985).

Defendants state that all inmates are allowed to move about their cellblock and within the common area, the day room, from 6 a.m. until 10 p.m. daily. (Doc. 24 at 8).  Defendants further claim they do not allow inmates outside for security reasons, including a lack of sufficient resources for supervision and the escape attempts of inmates in the past when outdoor exercise was permitted. (Id.).  Plaintiff concurs that he was allowed out of his cell, in the common area, all day until lock down and was allowed to exercise in that area if he desired.  (Doc. 22 at 39)  Due to the lack of outdoor recreation, Plaintiff makes the conclusory allegations that he suffered facial breakouts and had joint pain, but provides no additional facts to support his claim indicating his physical or mental health was actually harmed or even that there was a reasonable likelihood that it was

threatened.  Without more than a conclusory allegation evidencing minor skin breakouts, for which he obtained treatment each time he requested it, and minor joint soreness, Plaintiff cannot prove that his constitutional rights have been violated by the defendants' failure to provide him outdoor exercise time.  See Parratt v. Taylor, 451 U.S. 527, 535 (1981).  Plaintiff, therefore, fails to meet his burden on summary judgment of establishing that the policies of Defendants resulted in a denial of the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. Wilson, 501 U.S. at 297; Rhodes, 452 U.S. at 347. Hence, summary judgment is due to be granted in favor of the defendants on these claims.

     5.     Motion for Temporary Restraining Order.

Plaintiff's motion for temporary restraining order was received and docketed by the Court on October 27, 2014.  (Id).  Plaintiff alleges that Defendants were opening his outgoing and incoming legal mail, withholding time-sensitive mail, and making copies of correspondence between Plaintiff and the Court. (Doc. 3).  Plaintiff requested an injunction prohibiting Defendants from interfering with his access to the courts.

Defendant Bell contends that on October 20, 2014, one day prior to this Court docketing the current lawsuit, an officer approached him with an open piece of outgoing mail from Plaintiff, that did appear to be legal mail, and that contained Chief David Carpenter's name on it.  (Doc. 9 at 3).  Defendant Bell avers he did not read the document but had the officer make a copy of the document which Bell took to Defendant Yelding to ask what should be done under the jail's policy regarding prison mail.  (Id.).  Defendant Yelding instructed Defendant Bell not to read the document, to destroy its copy, and to seal the

original envelope and mail it that same day.  (Id.).  The Defendants acknowledge

the jail's written rules and procedures that outgoing mail may be subject to

opening and inspection for contraband, but the policy defines privileged mail as

that to and from attorneys, the courts and public officials.  (Doc. 9 at 4).  The

policy dictates that mail which is clearly marked as "legal mail" will only be

opened in the presence of the inmate.  (Id.).  Since the incident complained of,

officers have been counseled to only open privileged mail in the presence of the

inmate, and Defendants are not aware of any other similar incident.  (Id. at 5).

To prevail on a request for preliminary injunctive relief, the movant must

show:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to public interest.

Id.  Preliminary injunctive relief "is an extraordinary and drastic remedy[,]"

which will not be granted unless the movant carries the burden of persuasion on

the following four prerequisites. Zardui-Quintana v. Richard, 768 F.2d 1213, 1216

(11th Cir. 1985) (citation and quotations marks omitted).  And, Plaintiff has failed

to carry this burden.

The primary purpose of a temporary restraining order or a preliminary

injunction is to maintain the status quo of the parties until there is a trial on the

merits.  University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834,

68 L.Ed.2d 175 (1981).  Moreover, injunctive relief will issue only if the

complained of conduct is imminent and no other relief or compensation is available.  Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987). Furthermore, the law is settled that a § 1983 action filed by a prisoner seeking injunctive relief becomes moot one he is transferred or released from the facility where the cause of action arose.  *See Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (Plaintiff "was transferred to another facility shortly after his complaint was filed. . . . At that point, his claims for injunctive and declaratory relief relating to the conditions of his administrative segregation at the West Jefferson facility no longer presented a case or controversy.).

As to the case at hand, Plaintiff has failed to produce facts showing he is likely to prevail on the merits of his claim, and notably, he has been released from Daphne Jail, and thereby from the conditions of which he complains. Additionally, there is no evidence that Plaintiff will be returning to Daphne Jail; therefore, there is no evidence of "any continuing, present injury or real and immediate threat of repeated injury" to Plaintiff from these Defendants.  See Cotterall v. Paul, 755 F.2d 777, 780 (11th Cir. 1985); Dudley v. Stewart, 724 F.2d 1493, 1494 (11th Cir. 1984).

To the extent Plaintiff seeks an injunction on behalf of other unnamed inmates currently incarcerated in the Daphne Jail, his claim also fails. Plaintiff's attempt to procure injunctive relief on behalf of unnamed inmates is an impermissible attempt to assert third party rights in federal court.  The standing doctrine frowns upon attempts to assert rights for others outside the context of a class action lawsuit.  Generally, "a litigant must assert his own legal rights and interests and may not ordinarily rely on the rights and interests of third parties."

<u>Harris v. Evans</u>, 20 F.3d 1118, 1121 (11th Cir.), <u>cert. denied</u>, 513 U.S. 1045, 115 S. Ct. 641, 130 L. Ed. 2d 546 (1994).  "The prohibition against third-party standing promotes the fundamental purpose of the standing requirement by ensuring that the courts hear only concrete disputes between interested litigants who will frame the issues properly." <u>Id</u>. (citing <u>Schlesinger v. Reservists Comm. to Stop the War</u>, 418 U.S. 208, 220-21, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974)).  Inmates presently housed at Daphne Jail can assert their own constitutional rights should they choose to do so.  <u>See Harris</u>, 20 F.3d at 1124.  Accordingly, the sought injunctive and declaratory relief against Defendants is moot.

## V.      Conclusion

Based on the foregoing, it is recommended that Plaintiff's motion for a temporary restraining order be **denied** and the motion for summary judgment of Defendants be **granted** and that Plaintiff's action against Defendants be **dismissed** with prejudice.

## <u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. <u>See</u> 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); S.D. Ala. L.R. 72.4. The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and

the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this 30th day of June 2015.

s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE